PETTIGREW, J.
]2In this employment termination case, the terminated employee, Lome Cortez (Cortez), appeals the decision of the Civil Service Referee (Referee) as well as the denial by the Louisiana State Civil Service Commission (the Commission) of his application seeking review of the Referee’s decision. After a thorough review of the record, we affirm.
FACTUAL AND PROCEDURAL HISTORY
Cortez began his employment with the defendant, Department of Transportation and Development (DOTD), on July 14, 2003; and prior to his termination on June 26, 2013, he was a classified civil service employee serving with permanent status as an Information Technology Technical Support Specialist I for DOTD District 02, in the Houma, Louisiana sub-district area.
On June 4, 2013, Cortez received, by hand delivery, a written pre-deprivation notice from his Appointing Authority and ITS (Intelligence Transportation Systems) Director, Engineer 8, Stephen W. Glascock (Glascock). In that 6-page letter, Glas-cock detailed a sequence of events involving Cortez that had occurred on April 18 and 19, 2013, and informed Cortez that his conduct during those detailed events constituted violations of PPM No. 29, Employee Conduct; PPM No. 51, Use of Computers, and PPM No. 53, Violence in the Workplace. The letter provided Cortez with four detailed descriptions of his conduct allegedly in violation of PPM No. 29, and two detailed descriptions for each of the alleged violations of PPM Nos. 51 and 53. In conclusion, the letter informed Cortez:
Your unprofessional and inappropriate behavior, as well as your failure to follow direct orders, has violated the aforementioned prohibitions of PPM No. 29, PPM No. 51, and PPM No. 53. Your conduct has been highly disruptive to. the DOTD working environment ... you were unable to perform your job functions, you caused a considerable amount of time to be lost, reducing efficiency, as work productivity ceased to exist by both yourself and all those involved in these issues, you created a negative public image by having the general public witness your behavior, you failed to follow directives, and you impeded an investigation .... Additionally, your actions lower morale of your co-workers, and inefficiently manages (sic) DOTD’s resources.
*617 laCortez was additionally informed of his right to respond in writing and also that a pre-deprivation hearing had been scheduled for June 12, 2013. Cortez, through counsel, responded to the charges by letter dated June 18, 2013.
On June 26, 2013, by hand-delivery, Cortez received a written disciplinary action notice from Glascock that he was being dismissed from employment with DOTD effective on 4:00 p.m. that same date. Glascock, again, detailed the incidents and violations by Cortez’s conduct underlying his decision to terminate him. He acknowledged receipt and consideration of Cortez’s written response, via counsel, and informed Cortez of his right to appeal his dismissal.
Cortez filed a notice of appeal with the Commission on July 12, 2013, that was assigned to Referee Brent C. Frederick. Cortez was properly notified that the hearing would be held on October 8, 2013. The record contains a letter dated October 2, 2013, to Referee Frederick from counsel for DOTD, “confirming the substance of [a] status conference call” between them and counsel for Cortez, during which allegations were raised “concerning the ownership and presentation of firearms by Mr. Cortez.” The letter stated that DOTD, in an abundance of caution, had requested security measures. The letter also indicated that the Referee agreed to arrange for the presence of a law enforcement officer and metal detection devices at the hearing.
On October 3, 2013, Cortez filed a “Motion to Preclude the Introduction of Any Evidence by the [DOTD] or, in the alternative, Motion to Recuse Brent C. Frederick as Referee.” In a memorandum in support thereof, Cortez referred to allegations by DOTD that concerned statements made by Cortez at a private camp on July 4, 2013, which apparently led to the conference call and request for added security at the hearing on Cortez’s appeal of his dismissal. Without any substantiation whatsoever in the memorandum, Cortez accused DOTD of fabricating the incident with the intent to “preemptively torpedo [Cortez] to the Referee via a pretextual ‘perceived security concern’ of the DOTD.”
In its opposition memorandum, DOTD provided more detail concerning the status conference and request for security. Counsel for DOTD stated that the request came as a 14result of an incident witnessed by John Arceneaux, an employee of DOTD, “which involved Mr. Cortez brandishing weapons and ammunition while naming several high-ranking DOTD employees — one of which will be present at the hearing on appeal.” DOTD indicated that the incident had been reported by Mr. Arceneaux to his DOTD supervisors and to the Louisiana State Police.
On October 7, 2013, the Referee denied Cortez’s motions, and the appeal went forth as scheduled on October 8, 2013. Following that hearing, on December 6, 2013, the Referee rendered a decision including very detailed and thorough findings of facts and conclusions of law. In summary, the Referee found that the evidence established that Cortez was insubordinate to his superiors, engaged in inappropriate and unprofessional behavior, impeded an investigation, and violated agency policy, all to the detriment of state service; therefore, DOTD proved legal cause for terminating Cortez. Cortez then requested review of that decision by the Commission. That request was denied, and this appeal by Cortez of those decisions followed.
STANDARD OF REVIEW
An appellate court should affirm the Commission’s conclusions as to the existence or cause for dismissal of a permanent employee when the decision is not *618 arbitrary, capricious, or an abuse of the Commission’s discretion. Additionally, the decision of the Civil Service Commission is subject to review on any question of law or fact upon appeal and the court may only review findings of fact using the manifestly erroneous/clearly wrong standard of review. When there is a conflict in testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review. The Commission’s findings of fact cannot be manifestly erroneous where there are two permissible views of the evidence. Sumling v. Department of Health, 2014-1423 (La.11/7/14), 152 So.3d 134.
ASSIGNMENTS OF ERROR NOS. ONE and TWO
In these two assignments of error, Cortez asserts the Referee abused its discretion and erred in denying, both, his motion to preclude the introduction of evidence by DOTD as well as his alternative motion to recuse Referee Frederick. We note at the outset that |fiCortez has not stated any, nor have we found a valid legal basis for a motion to preclude the presentation of any and all evidence by a party at a hearing, for any grounds, We find such a motion to be an anomaly and, therefore, the Referee did not err in denying it. Pursuant to La. C.C.P. art. 154, if a valid ground for recusation is set forth in the motion, the judge shall either recuse himself, or refer; the motion to another judge or a judge ad hoc. Our review of the record, including the motion and memo-randa submitted both in support and opposition thereof, reveals nothing out of the ordinary in the Referee taking heed of DOTD’s request for added security in an abundance of caution, given the information provided by DOTD as a basis therefor, The presiding Referee, much as a trial judge, has great latitude and discretion in the management of his docket and courtroom, and this certainly includes taking whatever necessary precautions he deems appropriate to secure the sanctity and safety of the proceedings before him.
We find that the Referee acted not only within his vast discretion, but that he made the prudent and correct decision in allowing DOTD’s request to have a law enforcement officer in attendance at the hearing, in Sight of the detailed and substantiated information provided by DOTD that Cortez had exhibited aggressive and erratic behavior prior to and concerning the upcoming hearing on his termination.
Moreover, there is not even a shred of evidence in the record before us to support Cortez’s claims that the request itself, or the presence of the officer at the hearing, had any bearing whatsoever on the Referee’s conduct in presiding over the hearing, or in its final decision. The Referee’s decision is thorough and detailed and specifically based on the evidence relevant only to the incidents preceding and forming the basis for the termination. There was no mention made at the hearing of the added security in place or of any of the status conference communications that led to that measure. More significantly, there is absolutely no evidence of any bias, prejudice, or “tainting” on the part of the Referee in this matter. The written decision is thorough and detailed and makes no mention of the conference call or the information relayed therein. We note that a party seeking recusal of a judge has the burden of proving the basis therefor. See Whalen v. Murphy, 2005-2446 (La.App. 1 Cir. 9/15/06), 943 So.2d 504, 508, writ denied, 2006-2915 (La.3/16/07), 952 So.2d 696. However, Cortez merely argues of a “projected ... appearance of impropriety” and that the Retiree had “subliminal bias and influence ” by DOTD’s request for security. For obvious reasons, our law requires proof by competent and substan *619 tiating evidence, not mere assertions of “subliminal” bents. The transcript reveals that the hearing was in accordance with all proper procedures and the decision reveals it is based on a fair and impartial assessment of only the evidence presented therein. Accordingly, assignments of error numbers one and two have no merit.
ASSIGNMENTS OF ERROR NOS. THREE AND FOUR
In assignments of error numbers three and four, Cortez asserts the Referee abused its discretion in allowing the testimonies of John Rollins and Gary Gisclair at the hearing in this matter. Cortez alleges that the testimony .of these two DOTD employees improperly supplemented or enlarged the charges brought against him. We find no merit in these assignments. The gist of Cortez’s objection to the testimony of these two DOTD employees is that they were not mentioned in the initial incidents of misconduct by Cortez detailed in the pre-deprivation notice and, therefore, their testimony was not admissible. However, notwithstanding Cortez’s arguments, he does not mention that the testimony of these employees was, indeed, relevant to the charges brought against him. Facts relative to Cortez’s pre-termination interview with Mr'. Rollins were included in both the pre-deprivation notice as well as the dismissal notice. The pre-deprivation notice and dismissal notice were both very detailed and gave Cortez sufficient notice of the charges being brought against him, such that he was amply apprised of the incidents that would be discussed and questioned, as well as the relevant DOTD personnel who had firsthand knowledge of such, and may be called to testify as to that knowledge. Cortez, himself, during the course of these relevant incidents, included references to Mr. Gisclair’s involvement therewith; thus, he cannot genuinely express surprise or prejudice by Mr. Gisclair testifying at the hearing.
Finally, we note that Mr. Gisclair was called at the hearing specifically to rebut testimony elicited from Cortez’s attorney on cross-examination of DOTD witnesses, to the |7effect that Cortez had been subject to harassment by Mr. Gisclair. Accordingly, we find no merit to assignments of error numbers three and four.
ASSIGNMENTS OF ERROR NOS. FIVE AND SIX
In his last two assignments of error, Cortez asserts that the Referee abused its discretion in upholding the disciplinary action taken by DOTD in terminating his employment, and that the Commission abused its discretion in denying his application for review of that decision. For the following reasons, we find these assignments of error also lack merit.
By all accounts, prior to January 2013, Cortez had been a good worker with no work performance issues or disciplinary actions. In January 2013, there was an incident described as a “run-in” between Cortez and: a contract welder in which a verbal altercation ensued while the two were working together on a DOTD project. The record reveals little detail concerning this incident, but after an internal investigation, the welder was permanently suspended from the job by the project manager. Glascock testified that he met with Cortez after the incident, and Cortez made statements to him that he was having “run-ins” with fellow co-workers and other contracted personnel making fun of him and harassing him. However, according to Glascock, these statements were unspecific and unsubstantiated, and he considered the incident resolved since the welder with whom Cortez had the problem had been terminated from the project. *620 However, he did testify that he was concerned by Cortez’s apparent feeling of “self-importance” in that he was being singled out by the media, and also noted concern that Cortez seemed increasingly paranoid and complaining of “conspiracy” efforts by other DOTD employees against him.
The gist of the underlying incidents immediately leading to Cortez’s termination are two emails that Cortez sent to Glas-cock, one at 7:23 a.m. and the other at 8:16 a.m., on April 18, 2013; a meeting that was set up to address Cortez’s conduct and his failure to attend such meeting; a voice message that Cortez left for Glascock after he failed to attend the scheduled meeting; and a meeting that was ultimately had with Cortez on April 19, 2013. The record contains the testimony of many witnesses who were called to testify on behalf of DOTD, including Cortez’s supervisors (Glascock, Drago, and Smith), |RMr. Rollins (DOTD’s compliance investigator), and Nakesla Blount, DOTD’s Human Resources Specialist at the time. The record also contains the actual emails and voice-mail at issue that were sent by Cortez to Glascock, which were entered into evidence at the hearing in this matter. In addressing Mr. Cortez’s assignments of error; however, the evidence in the record will be summarized below to the extent necessary to resolve the issues raised on appeal.
The first email contained unsubstantiated accounts of Cortez having been approached late (at approximately 10:30 p.m.) the previous night by two unknown men, whom Cortez identified as “news media” personnel, who allegedly were seeking information from Cortez about alleged malfunctions at the new LA 1 toll machines and DOTD’s spending of taxpayers’ dollars. Cortez stated in this email that he felt the media was “singling” him out on his personal time, that this was not the first time he had been approached with disturbing concerns and questions about the toll bridge, and that he found the increasing concern of the media on behalf of concerned taxpaying citizens very disturbing. He stated that he got back into his vehicle and left, but further noted, “[i]n my sincere opinion this entire ordeal is quickly growing out of control.” Despite the contents of the email, later when questioned, Cortez explained that he was sitting on the side of the road, in his car, at 10:30 p.m. when he was approached by two strangers. The only description that he was able to provide of the two was that they were both white males, and they appeared to be wearing pants. He was unable to provide any other substantiation for his claim that they were media personnel.
Before Glascock could respond, he received the second email, which was much more personal and emotional in nature. Although noted in the subject line as “Confidential,” in addition to Glascock, Cortez sent copies thereof to his immediate supervisor, Mr. Joe Drago (Drago), his second-in-line supervisor, Mr. Erik Smith, and Ms. Carryn Ferrier, a DOTD employee from another district. This email made several personal and non-work-related statements critical of Glascock, inferring, without detail, that Glascock was no longer the admirable Christian man with moral value, dignity, compassion, and a respect for truth that Cortez had known him to be fot the “over six 19years” they had known each other. The email indicated that Cortez and “several of us in your department” were “concerned and confused” about Glascock’s actions and lack thereof; however, no specific detail or incidents upon which those concerns were based were cited in the email. Cortez urged Glascock to allow “the truth to free [him] from whatever ... is obviously troubling [him], and *621 ended by stating that if he could not do so for his “own personal dignity” to “please do it for your innocent children.”
Following receipt of the emails, which Glascock found concerning and threatening, he contacted Human Resources personnel, Elena Branzaru and Nakesla Blount. Following that consultation, Glas-cock decided to contact Cortez and direct him to drive to headquarters in Baton Rouge for a meeting that same date (April 18, 2013) with DOTD’s Compliance Investigator 4A, Mr. Rollins. According to Glas-cock, Cortez was contacted at approximately 10:30 a.m. and ordered to obtain a DOTD vehicle and drive to Baton Rouge for a meeting with Mr. Rollins at 1:30 or 2:00 p.m. (By all accounts, the drive from Houma to Baton Rouge takes approximately one and a half to two hours.)
Cortez never arrived in Baton Rouge for the meeting. The record reveals that he gave inconsistent and unsubstantiated excuses for not being able to arrive in Baton Rouge. Despite having been instructed at approximately 10:30 a.m. to leave Houma, Cortez emailed his supervisor Drago near noon, informing him that he was just then attaining a DOTD truck to drive to Baton Rouge. Testimony revealed that this information was relayed to Mr. Rollins in Baton Rouge, who then pushed back his. meeting with Cortez to 2:30 p.m., and that the rescheduled time was also relayed back to Cortez. According to some testimony, Cortez complained of being sick and having to stop at a McDonald’s in Sorrento to eat; however, this allegedly occurred at 1:30 p.m., and did not coincide with the appropriate amount of time it should have taken him to arrive in Sorrento. Further, according to other testimony, instead of complaining that he was sick, Cortez had reported that he was having mechanical problems with the DOTD truck, stating he was having trouble steering and keeping it in its lane of travel. In light of the conflicting excuses, Glascock was contacted and he made the decision to cancel the meeting in Baton Rouge, and sent Drago and another employee to Sorrento, for the other employee 11nto drive the DOTD truck back to Houma, and for Drago to drive Cortez back to his own personal vehicle in Houma. Glascock also instructed Drago to order Cortez to go to a doctor once he got back to Houma and to report for a meeting with Mr. Rollins the following morning, with a doctor’s excuse.
When Drago and the other employee, Don Bastin (IT Support Specialist 3, DOTD Section 56), arrived at the McDonald’s in Sorrento, they were met by a Sorrento Police Officer who had responded to a 911 call that Cortez had made from the restaurant. Officer Cathy Gil testified that she had been contacted by a dispatcher at approximately 2:41 p.m. on April 18, 2013, in reference to a “disturbance or problem” that the caller (Cortez) was having with his supervisor. Officer Gil testified that she arrived at McDonald’s and spoke with Cortez. She testified: that Cortez told her that his work supervisor was harassing him and that he then started “talking about religion.” She further testified there was no evidence or substantiation of the harassment and threats that Cortez spoke of, and that she further advised him that everything of which he complained had allegedly occurred outside of the city’s limits; therefore, there was nothing law enforcement could do for him. She stated that Cortez’s supervisor arrived to give Cortez a ride back to Houma and she left the scene.
Bastin testified that he rode with other IT technicians to Sorrento in order to drive a DOTD truck, which reportedly was having mechanical problems, back to Hou-ma. He stated that when he arrived, he saw a police officer coming out of the door *622 at McDonald’s, but he had no contact with her. He also stated that the truck did not have any mechanical or other driving problems, but that it ONLY needed gas. He stopped and refueled it with a DOTD fuel card that all employees had access to when driving a DOTD vehicle. He stated that after refueling the truck, he drove it back to Houma, following Drago and Cortez who rode together in another vehicle.
Drago wrote a 'statement that he had driven Cortez back to Houma and relayed to Cortez Glascock’s orders that Cortez meet with-Mr. Rollins the following morning, April 19, 2013, at 9:00 a.m., and that he needed to bring a doctor’s slip with him. According to |1TPrago’s written statement, Cortez stated that he did not want Drago to bring him to the doctor.
On the evening of April 18, 2013, Cortez made two telephone calls in which he left voicemails, one to Glascock and the other to Glascock’s secretary. The voicemails were played at the hearing and are included in the record before this court. They reveal agitated and rambling communication from Cortez, seemingly arguing about having to be present at the meeting the following morning, as ordered, due to his already having worked his required forty hours and having been told to not work overtime without permission.
Cortez did meet with Mr. Rollins, as ordered on April 19, however, he did not have the doctor’s note he was ordered to present, stating that he did not need one since he had worked his forty hours and had not taken sick leave. Mr. Rollins testified that during this meeting, Cortez began talking about very inappropriate, personal, non-work-related matters concerning Mr. Glascock that, again, Mr. Rollins was unable to substantiate. Cortez was given the opportunity, but again, could not provide any further credible substantiation for his claims that he had been singled out and was being questioned by the media, or for his claims that there was a “conspiracy” against him, including alleged harassment against him by co-employees.
Mr. Glascock concluded that the information Cortez presented to Mr. Rollins during the interview, to Drago, and to him were “false, misleading and inaccurate, highly inappropriate, and indicative of workplace violence,” He found Cortez’s conduct had been disruptive to the DOTD workplace environment, reducing efficiency, and in particular, in reference to Cortez’s call to 911, that he created a negative public image. He further found that, by failing to attend the meeting scheduled on April 18, 2013, in Baton Rouge, Cortez had failed to follow directives and impeded an investigation.
CONCLUSION
Based on all the foregoing evidence, and giving detailed findings of fact and conclusions of law, the Referee found DOTD proved that Cortez was insubordinate to his superiors, engaged in inappropriate and unprofessional behavior, impeded an | ^investigation, and violated agency policy, all to the Detriment of state services. He also concluded that DOTD had legal cause for discipline and that the penalty imposed — termination—was commensurate with the offenses.
Our review of the record reveals that it amply supports the findings of the Referee and the Commission’s denial of Cortez’s request'for review of that decision. Accordingly, the decision of the Commission, denying to review the decision of the Referee, and the decision of the Referee are hereby affirmed. All costs of this appeal are assessed to Mr. Lome Cortez.
AFFIRMED.